UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

PASCALE PERARD,

                    Plaintiff,

                                        **MEMORANDUM AND ORDER**

        -against-                       18-CV-6661 (KAM)(RER)


JAMAICA HOSPITAL MEDICAL CENTER,

                    Defendant.

--------------------------------------X

**MATSUMOTO, United States District Judge:**

        On November 21, 2018, plaintiff Pascale Perard

commenced this action against Jamaica Hospital Medical Center

("JHMC", "Hospital" or "defendant"), pursuant to Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et

seq.*[1], the New York State Human Rights Law ("NYSHRL"), N.Y. Exec.

Law 290, *et seq.*, and the New York City Human Rights Law

("NYCHRL"), N.Y. Admin. Code 8-101, *et seq.*, seeking a

declaratory judgment and damages to address the injuries she

allegedly suffered due to racial and/or national origin

---

[1] Under Title VII, only incidents occurring on or after March 1, 2017 (or 300
days before plaintiff filed her EEOC complaint) are timely and relevant.
*Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994).  For plaintiff's
NYSHRL and NYCHRL claims, occurrences before November 21, 2015 (three years
before her complaint) are time-barred.  *Taylor v. City of New York*, 207 F.
Supp. 3d 293, 302 (S.D.N.Y. 2016) (citing *Kassner v. 2nd Ave. Delicatessen
Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).

1

discrimination, hostile work environment, and retaliation.  (ECF No. 1, Complaint.)  On December 14, 2018, plaintiff filed an amended complaint, raising the same claims.  (ECF No. 7, "Am. Compl.")

Pending before the court is defendant's motion for summary judgment.  For the reasons set forth below, the court grants in part and denies in part defendant's motion.

## PROCEDURAL HISTORY

On December 27, 2017, plaintiff filed a Verified Complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").  (ECF No. 36-5, Ex. C.)  On August 23, 2018, the EEOC issued a Dismissal and Notice of Rights, which granted plaintiff the right to sue in federal court.  (ECF No. 36-6, Ex. D.)  On November 21, 2018, plaintiff commenced this action by filing a complaint in federal court.  (ECF No. 1, Compl.)  On December 14, 2018, plaintiff filed her Amended Complaint.  (ECF No. 7, Am. Compl.)

On December 13, 2019, defendant filed a letter requesting a pre-motion conference in anticipation of its motion for summary judgment and requesting a briefing schedule.  (ECF No. 28, Letter Requesting a Pre-Motion Conference.)  On December 20, 2019, plaintiff filed her letter in opposition to defendant's request for a pre-motion conference.  (ECF No. 29, Letter.)  On December 23, 2019, the parties participated in a

pre-motion conference.  The parties reported that they had attended a mediation, and were not able to settle the case.  The court approved a briefing schedule for defendant's motion for summary judgment.

On February 28, 2020, defendant filed its motion for summary judgment on the claims in plaintiff's amended complaint. (ECF No. 32, Notice of Motion for Summary Judgment.)  Defendant asserts that "the evidence shows that Plaintiff was not discriminated against, or even treated 'less well' than others because of her race and nationality, or based on any other protected characteristic," "most of the incidents of which Plaintiff complains are time-barred," and with respect to any claims that are not time-barred, there is no material issue of fact that Plaintiff has failed to establish that she is entitled to relief under any theory.  (ECF No. 33, "Def. Mem." at 9.) Plaintiff's opposition brief argues that defendant's motion should be denied "based upon the existence of multiple material issues of fact from which a juror could find that Ms. Perard was the victim of discrimination based upon her race and national origin" and that defendant excluded certain "critical" material facts.  (ECF No. 36, "Opp. Mem." at 7.)

## BACKGROUND

### I.   Factual Background

The facts in this section are taken from defendant's Rule 56.1 statement (ECF No. 33-17, "Def. 56.1"), plaintiff's response to defendant's Rule 56.1 statement (ECF No. 36-1, "Pl. 56.1"), and the parties' declarations and exhibits, and they are considered in the light most favorable to plaintiff, the non-moving party.

FRCP 56 and Local Rule 56.1

The court notes that, as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1, defendant's 56.1 statement of undisputed material facts is supported by citations to admissible evidence.  In plaintiff's counter-56.1 statement, plaintiff did not comply with Local Rule 56.1(d), which provides in relevant part, "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  L.R. 56.1(d).  Nor did plaintiff submit a "separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("L.R.") 56.1(b).

Because plaintiff fails to cite to evidence as required by the Local Rules and the Federal Rules of Civil

Procedure, the court has examined the facts and supporting evidence that defendant set forth in its 56.1 statement to be undisputed. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir 2003) (where "the opposing party [] fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted") (citing Local Rule 56.1(c)).

The court has independently reviewed defendant's citations to facts in the record, which plaintiff has largely admitted. Although plaintiff purports to dispute a small number of facts, the court generally finds those disputed facts to be trifling rather than material. (*See generally* 56.1 Resp. ¶¶ 3, 20, 24, 27, 41, 66.) Moreover, as noted above, plaintiff has not cited to any evidence in support of the naked denials and assertions in plaintiff's 56.1 responsive statement. (*Compare* 56.1 Resp. ¶ 29 *and* ECF No. 33-11, Ex. H; *compare* 56.1 Resp. ¶ 58 *and* JA, Ex. G, 119:3-18; JA, Ex. E, 49:2-17; *compare* 56.1 Resp. ¶ 66 *and* JA, Ex. G, 131:5-25.[2]) Furthermore, although plaintiff's opposition memorandum accuses defendant of

---

[2] For example, and *inter alia*, plaintiff has not countered defendant's 56.1 statement that Ms. Singh, a CNM, was paid a starting salary of $125,000, which was $5,000 more than some CNMs, because she worked the less desirable overnight shift from 11:00 p.m. to 7:00 a.m. Although plaintiff "maintain[s] at least some motivation for Singh's higher salary was to groom her for a higher position and due to favoritism towards her race and national origin," plaintiff has cited to no evidence in support of that factual assertion. Accordingly, plaintiff's unsupported and conclusory assertion must be and is rejected.

"conveniently exclud[ing] from its list of 'material facts' certain facts that are critical to this matter," plaintiff failed to provide a counterstatement of material facts and supporting evidence pursuant to the Local Rules and the Federal Rules of Civil Procedure.  Thus, pursuant to Federal Rule of Civil Procedure 56(e)(2) and (3), the court may properly consider defendant's facts undisputed for purposes of the motion for summary judgment.

Plaintiff's Employment at JHMC (2002-2018)

Plaintiff, an American citizen who self-identifies as black and Haitian, was hired by JHMC in 2002 as a registered nurse.  (ECF No. 36-1 ("56.1 Resp.") ¶¶ 10-12; ECF No. 36-4, Perard Dep. 34:4-9.)  Plaintiff immigrated to the United States over 30 years ago.  (56.1 Resp. ¶ 9.)

JHMC, the defendant, is situated in and serves an underserved community, and was struggling financially.  (56.1 Resp. ¶ 3.)  The Hospital employs a diverse workforce, which reflects the neighborhood in which the Hospital is located, Richmond Hill, with its population that speaks approximately 138 languages.  (*Id.* ¶¶ 2, 4.)  The Hospital attempts to hire bilingual employees because the ability to communicate in the same language as a patient facilitates patient care.  (*Id.* ¶ 7.) The Hospital's staff speaks approximately 100 different languages.  (*Id.* ¶ 8.)

Plaintiff was initially hired to work as a staff nurse in the Emergency Department ("ED") by Ms. Maryanne Settner, and went on to hold two other positions at the Hospital, also within the ED. (*Id.* at 34:10-20.) Plaintiff worked full-time at JMHC for approximately 16 years in the ED, until her resignation on May 25, 2018. (*Id.* at 33:19-25-33:1-2; ECF No. 36-1 ¶¶ 88-91.) Plaintiff is married to Carl Perard, who is also black and Haitian. (56.1 Resp. ¶¶ 14-15.) As of February 2020, Mr. Perard worked at JMHC as the Assistant Head Nurse of the Intensive Care Unit ("ICU"). (*Id.* ¶ 14.)

The Hospital has a policy regarding how to handle employee discrimination complaints. (*Id.* ¶ 16.) Plaintiff never received a negative performance evaluation, from February 2015 until she resigned from JMHC. (*Id.* ¶ 18.) In addition, plaintiff was never subject to discipline during her 16-year tenure at JHMC. (*Id.* ¶ 19.)

From approximately April 2014 until December 2017, Anata Kanevsky was employed as the Director of Nursing of the ED and the ICU at the Hospital. (*Id.* ¶ 20.) Kathleen Scher was hired as Chief Nursing Officer ("CNO") in February 2015, and Ms. Kanevsky reported directly to CNO Scher. (*Id.* ¶¶ 21-22.) Ms. Kanevsky was plaintiff's direct supervisor from 2014 until plaintiff went on medical leave on about November 27, 2017. (*Id.* ¶ 23.) Though the parties dispute whether Ms. Kanevsky was

also Carl Perard's direct supervisor, the parties agree that Ms.
Kanevsky made the decision to promote Carl Perard from
registered nurse to Assistant Head Nurse.  (*Id.* ¶¶ 24-25.)  Ms.
Kanevsky and plaintiff both worked the day shift, 7:00 a.m. to
3:00 p.m., and Ms. Kanevsky often "covered" for plaintiff and
frequently dealt with the negativity regarding the ED department
in order to protect plaintiff.  (*Id.* ¶¶ 26-27.)

        The parties dispute the frequency with which plaintiff
encountered CNO Scher during the latter three years of
plaintiff's employment.  Plaintiff agrees, however, that CNO
Scher only visited the ED five times, for less than 15 minutes
each time, during a period of a year and a half.  (*Id.* ¶¶ 29-
30.)  The parties further agree that CNO Scher belittled the
entire ED team.  (*Id.* ¶ 31.)  CNO Scher never "messed" with Carl
Perard.  (*Id.* ¶ 32.)  Plaintiff alleges that Robin Blackwell, a
registered nurse who previously worked as a Director in the
Medical/Surgical Department and then as a Director of Regulatory
Affairs, between 2012 until the present, made discriminatory
racial comments to plaintiff, including calling her "black
Haitian," which Ms. Blackwell has denied in a sworn declaration.
(*Id.* ¶ 33; ECF No. 33-1, Blackwell Decl. ¶¶ 2-6.)  It is
undisputed that Ms. Blackwell's husband of 43 years is black,
and that they have four biracial children together.  (ECF No.
36-1, 56.1 Resp. ¶¶ 34-35.)

8

Ms. Blackwell did not work with or supervise plaintiff in the ED.  Ms. Blackwell, who had no work responsibilities involving the ED, did not routinely visit the ED, where plaintiff worked.  (ECF No. 33-1, Blackwell Decl. ¶ 5.)  Ms. Blackwell stated that she "rarely" interacted with plaintiff, and would more typically deal with plaintiff's supervisor, Ms. Kanevsky, as they were both Directors in their respective departments.  (*Id.* ¶ 4.)

Plaintiff's 2015 Promotion to CNC

Plaintiff had limited supervisory experience in her position as a staff nurse.  (*Id.* ¶ 36.)  In April 2015, plaintiff was promoted to Clinical Nurse Coordinator ("CNC"). (*Id.* ¶ 37.)  The CNC position was vacated by the prior CNC, "Manny," who was from the Philippines, and who left the role after being promoted to Clinical Nurse Manager.  (*Id.* ¶ 40.) When plaintiff was promoted to CNC from staff nurse, her base annual salary increased from $81,853.39 to $114,576.80 per year. (*Id.* ¶ 42.)  At the time of plaintiff's promotion from staff nurse to CNC, the Hospital had three total CNM positions in the ED, as discussed below.  (*Id.* ¶ 43.)  The "purpose of promoting Plaintiff to CNC was to give her the opportunity to 'grow and train."[3]  (ECF No. 33-4, Ex. A, 12:3-10.)

---

[3] Plaintiff failed to submit a "separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Rules of the United States District Courts

In 2015, CNO Scher opposed plaintiff's promotion to Clinical Nurse Manager.  Despite being turned down for a promotion to Clinical Nurse Manager, plaintiff was promoted from staff nurse to a Clinical Nurse Coordinator in the ED. Plaintiff continued to serve as a CNC until approximately one and a half years later, when she was promoted to CNM, the position for which she had interviewed and applied in 2015.

<u>Individuals Promoted or Hired as CNMs Prior to Plaintiff's Promotion to CNM</u>

Prior to plaintiff's promotion to CNM in late 2016, Ms. Kanevsky hired three CNMs during her employment at the Hospital: Alicia McCaskie and Diahann Singh for the ED, and Robert Pryce for the ICU.  (*Id.* ¶ 46.)  McCaskie, Singh, and Pryce each had years of supervisory experience prior to being hired by defendant.  (*Id.* ¶ 47.)

Before Ms. Kanevsky officially offered someone a position, she needed to get approval from CNO Scher.  (*Id.* ¶ 48.)  Mr. Pryce, who is black and from Jamaica, and speaks with a heavy accent, was offered a starting salary of $120,000.  (*Id.* ¶¶ 49-50; ECF No. 33-2, Pryce Decl. ¶ 4.)  Mr. Pryce was

---

for the Southern and Eastern Districts of New York ("L.R.") 56.1(b). Further, pursuant to Local Rule 56.1(d), "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).  Accordingly, the court finds the assertion that plaintiff was promoted to give her an opportunity for career growth is established.

subsequently approached by CNO Scher, who encouraged him to apply for a Director position. (*Id.* ¶ 51.)  Mr. Pryce was promoted to Director of Nursing Critical Care. (*Id.* ¶ 52.)

Like Mr. Pryce, Ms. McCaskie was hired at a starting salary of $120,000, and she worked from 3:00 p.m. to 11:00 p.m. in the ED. (*Id.* ¶¶ 53, 55.)  Prior to Ms. McCaskie's hire, CNO Scher met with her and approved hiring Ms. McCaskie. (*Id.* ¶¶ 55-56.)  Ms. McCaskie self-identifies as black and is from St. Lucia. (*Id.* ¶ 57.)  McCaskie also speaks with an accent. (ECF No. 33-2, Pryce Decl. ¶ 6.)

Ms. Singh was hired at a starting salary of $125,000 because she worked the less desirable night shift, from 11:00 p.m. to 7:00 a.m. (*Id.* ¶ 58.)  Ms. Singh self-identifies as black and Guyanese. (*Id.* ¶ 59.)

Plaintiff's 2016 Promotion to CNM

In August 2016, plaintiff met with Trina Cornet, Vice President of Human Resources, to discuss her desire to be promoted to CNM and to have her salary increased to $120,000. (56.1 Resp. ¶ 60.)  Plaintiff alleges that Mrs. Cornet made discriminatory racial comments to her, *i.e.* telling plaintiff, "You're black and from Haiti." (*Id.* ¶ 62.)  Mrs. Cornet is black and is married to a Haitian man, with whom she has three children. (*Id.* ¶¶ 63-64.)  Furthermore, Mrs. Cornet is part Haitian herself, as she has a Haitian grandmother. (*Id.* ¶ 65.)

11

Notwithstanding Mrs. Cornet's Haitian background and family, plaintiff alleges that Mrs. Cornet targeted plaintiff, due to plaintiff's race and national origin. (*Id.* ¶ 66.)

In October 2016, Mrs. Cornet agreed to increase plaintiff's salary to $120,000, retroactive to August 4, 2016. (*Id.* ¶ 68.) Plaintiff's new base salary of $120,000 was higher than some CNMs who were white, Asian, and black. (*Id.* ¶ 69.) In the year that plaintiff was promoted to CNM, plaintiff also requested the Hospital's annual general wage increase of 3%, which, calculated based on her new salary of $120,000, would have equaled an additional $3,600 before taxes. (*Id.* ¶ 70.)

Though Mrs. Cornet initially believed plaintiff would be eligible for both the salary increase and the general wage increase in the same year, she later advised plaintiff that she had been mistaken, as there was an existing Hospital policy that does not grant a general wage increase to an employee who had already received a salary increase within the past year. (*Id.* ¶¶ 71-72.) In 2017, the year following plaintiff's promotion to CNM, plaintiff received the annual general wage increase, which increased her salary to $123,600. (*Id.* ¶ 77.)

Plaintiff's Work Responsibilities as CNM

As a CNM, plaintiff, along with the other CNMs in the ED, were required to perform bedside care, staff nurse duties, charge nurse duties, push stretchers, triage, and provide relief

12

when others went on break, because Ms. Kanevsky asked them to perform such duties. (*Id.* ¶ 78.) Although plaintiff was scheduled to work 37.5 hours per week, she and others were sometimes asked to work in excess of their scheduled hours due to staffing issues. (*Id.* ¶ 80.) In addition to her salary, plaintiff was paid according to her "straight time" hourly rate for any hours that she worked beyond her scheduled 37.5 hours per week. (*Id.* ¶ 81.) Other employees also received "straight time" pay, over and above their annual base salary. (*Id.* ¶ 82.)

Plaintiff Commenced Medical Leave and Ended Employment at JHMC

On November 27, 2017, plaintiff was assaulted by a patient while working at the Hospital, and shortly thereafter, plaintiff went on medical leave. (*Id.* ¶ 83.) On December 27, 2017, plaintiff filed a complaint with the EEOC. (*Id.* ¶ 84.) While plaintiff was on medical leave, no supervisors from the Hospital contacted plaintiff. (*Id.* ¶ 85.) Plaintiff began searching for a new job while she was on medical leave. (*Id.* ¶ 86.) By the time plaintiff returned to JHMC from medical leave, plaintiff had received multiple job offers, from Trinitas Hospital and Montefiore Hospital. (*Id.* ¶ 87.) Plaintiff discussed with Ms. Kanevsky whether or not she should follow Ms. Kanevsky to Trinitas Hospital, accept the other job offer, or return to JHMC. (ECF No. 33-10, Ex. G, 193:15-25.)

On May 25, 2018, plaintiff returned to the Hospital from medical leave, with a letter of resignation in hand, which she had written the night before. (*Id.* ¶ 88; *see also* ECF No. 36-4, Ex. B, at 190:11-20; ECF No. 36-10, Ex. G, at 193:2-4.) Unidentified staff members allegedly told plaintiff when she arrived at the Hospital, "Don't stay because they might kick you out, just like they did to Anata Kanevsky." (*Id.* ¶ 89; *see also* ECF No. 36-4, Ex. B, at 187:2-16.) Plaintiff was afraid of being fired because Ms. Kanevsky had been fired five months prior, in December 2017. (*Id.* ¶ 90.) Plaintiff resigned on the spot, before 9:00 a.m., on May 25, 2018. (*Id.* ¶ 91.) Plaintiff did not see CNO Scher the day that she resigned. (*Id.* ¶ 92.)

The following week, also in May 2018, plaintiff began working at Trinitas Hospital as Associate Director of the ED. (*Id.* ¶ 93.) Plaintiff's immediate supervisor at Trinitas Hospital is Ms. Kanevsky. (*Id.* ¶ 94.) Plaintiff decided to work at Trinitas because she wanted "protection," which she felt that Ms. Kanevsky could provide. (*Id.* ¶ 95.) Plaintiff's starting salary at Trinitas Hospital was $130,000 per year. (*Id.* ¶ 96.) As of November 7, 2019, plaintiff was still employed by Trinitas Hospital and earning $132,000 per year. (*Id.* ¶ 97.)

<u>Plaintiff's Filing of an EEOC Complaint</u>

The facts regarding plaintiff's EEOC complaint, which were sworn to be true under penalty of perjury, are taken from plaintiff's EEOC Complaint.  (ECF No. 33-5, Ex. B.)  In August 2016, plaintiff met with Mrs. Cornet to complain about her salary, her title, and how she was allegedly being treated by CNO Scher and her "clique."  Mrs. Cornet allegedly told her, "What more do you want, you're black and from Haiti, in that poor country you . . . would not make that much anyway."  (*Id.* at 8.)

In September 2016, plaintiff met with Mrs. Cornet a second time "to get an update" on her grievance from the previous month.  Although Mrs. Cornet told plaintiff that her credentials and education were not on the level of the other CNMs, Mrs. Cornet eventually agreed at the meeting to promote plaintiff to nurse manager, a position with a $120,000 annual salary and a 3% annual raise.  (*Id.*)

Plaintiff alleges that "Robin Blackwell would come to ED on many occasions to harass [her] and mak[e] racial comments such as 'black Haitian.'"  Plaintiff alleges that associates of CNO Scher laughed and made fun of her.  (ECF No. 36-5, Ex. C, at 7.)

During a May 2017 staff meeting with CNO Scher, Ms. Kanevsky, plaintiff, and other nurse managers in attendance, CNO Scher allegedly pointed fingers at Ms. Kanevsky and plaintiff,

stating that they were "not approachable" and "raising her voice" at them. (*Id.* at 9). Plaintiff deems this behavior by CNO Scher to be "retaliation." (*Id.*) During a July 2017 staff meeting conducted by CNO Scher, CNO Scher allegedly looked at Ms. Kanevsky with "a dirty look" and, in a "hostile" tone, dispelled rumors that she was leaving. (*Id.*) During a staff meeting in August 2017, Ms. Susan Iavino allegedly made a comment about a Russian nurse, asking whether English was her second language. Plaintiff was offended because "[i]t was a laughing matter to everyone in the room" except her, for whom English was her second language. (*Id.* at 9-10.) In September 2017, CNO Scher and others allegedly conducted interviews to replace plaintiff. Plaintiff also alleges that CNO Scher coerced Ms. Kanevsky to give plaintiff bad performance evaluations. (*Id.* at 10.[4])

Plaintiff stated that the reason she quit her job at JHMC in May 2018 was that she "had concluded that [her] contributions at JHMC were unappreciated and unrewarded, and that it was unconscionable for [her] to remain with a company that neither rewards [her] accomplishments nor recognizes [her] potential[.]" (*Id.* at 13.) She further stated that she

---

[4] This is somewhat supported by the record. Ms. Kanevsky testified at her deposition that she rewrote plaintiff's performance review to make it "as neutral [as] possible" and tone down the praise." (JA 116:20-117:3.)

"believe[d] that [she] was forced to resign due to the hostile and discriminatory work environment." (*Id.*)

<u>EEOC's Right to Sue Letter</u>

On August 23, 2018, the EEOC issued plaintiff a Right to Sue Letter and a written determination of plaintiff's charge. (*Id.* ¶ 98.)  The EEOC determined that plaintiff's allegations did not show any evidence of unlawful discrimination or retaliation against plaintiff. (*Id.* ¶ 99.)  The EEOC also determined that plaintiff had suffered no adverse employment action. (*Id.* ¶ 100.)  The EEOC further determined that the behavior plaintiff claimed forced her to resign was not sufficiently severe or pervasive to rise to the level of a hostile work environment. (*Id.* ¶ 101.)  The EEOC also determined that, although plaintiff may have been offended by the incidents and behavior in the workplace, a reasonable person would not have been. (*Id.* ¶ 102.)  Finally, the EEOC determined that a reasonable person would not have felt compelled to resign under the same circumstances that plaintiff experienced and, thus, plaintiff was not constructively discharged. (*Id.* ¶ 103.)

**LEGAL STANDARD**

I.  **Motion for Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), "and the facts as to which there is no

17

such issue warrant the entry of judgment for the moving party as a matter of law." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

If the moving party can show that "there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Peterson v. Regina*, 935 F. Supp. 2d 628, 634 (S.D.N.Y. 2013) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To defeat a motion for summary judgment, the non-moving party must identify probative, admissible evidence from which a reasonable factfinder could find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986). It

18

"requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." 477 U.S. at 261 n.2 (citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. . . . [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." 477 U.S. at 248. If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (citing *Gallo v.*

19

*Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224
(2d Cir. 1994)).  But "[e]ven in the discrimination context,
however, a plaintiff must provide more than conclusory
allegations to resist a motion for summary judgment." *Id.*
(citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).
"Summary judgment is appropriate even in discrimination cases,
for, as [the Second Circuit has] noted, 'the salutary purposes
of summary judgment – avoiding protracted, expensive and
harassing trials – apply no less to discrimination cases than to
. . . other areas of litigation.'" *Weinstock v. Columbia Univ.*,
224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

## DISCUSSION

The material relevant facts are largely undisputed.
As noted above, defendant moves to dismiss the Amended
Complaint, in its entirety, because "the evidence shows that
Plaintiff was not discriminated against, or even treated 'less
well' than others because of her race and nationality, or based
on any other protected characteristic," "most of the incidents
of which Plaintiff complains are time-barred," and with respect
to any claims that are not time-barred, there is no material
issue of fact that Plaintiff has failed to establish that she is
entitled to relief under any theory.  (ECF No. 33, "Def. Mem."
at 9.)

For the reasons set forth below, the court GRANTS defendant summary judgment with respect to each of plaintiff's federal and state claims, and with respect to one of plaintiff's NYCHRL claims.

## I. Plaintiff's Race and National Origin Discrimination Claims under Title VII and the NYSHRL Fail

### a. Legal Standard

Under the Supreme Court's *McDonnell Douglas* framework, "a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent." *Fanelli v. New York*, 200 F. Supp. 3d 363, 370 (E.D.N.Y. 2016) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003)).

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (citation and internal quotation marks omitted). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or

other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (alternation, citation, and internal quotation marks omitted). *See also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."); *Rasko v. New York City Admin. for Children's Servs.*, 734 F. App'x 52, 54 (2d Cir. 2018) ("Informal discipline, criticism, or counseling does not constitute an adverse act if no change in working conditions accompanies it.").

Plaintiff "bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Moschetti v. N.Y.C. Dep't of Educ.*, 778 F. App'x 65, 65-66 (2d Cir. 2019). "The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle." *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 375 (E.D.N.Y. 2013) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009)), *aff'd,* 578 F. App'x 34 (2d Cir. 2014). "To rebut an

22

employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are 'conclusory and unsupported by evidence of any weight.'" *Id.* (citing *Smith v. Am. Ex. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988)). *See also Chan v. Donahoe*, 63 F. Supp. 3d 271, 297 (E.D.N.Y. 2014) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013)) ("In order to successfully rebut an employer's purported non-discriminatory reason for the employment action, the plaintiff must establish pretext."). "Thus, when the district court considers whether the evidence can support a verdict of discrimination on a motion for summary judgment, it 'must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination.'" *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (citing *Fisher v. Vassar College*, 114 F.3d 1332, 1347 (2d Cir. 1997)).

"Claims brought under the NYSHRL are analyzed identically and the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999), *overruled on other grounds by*

*Meacham v. Knolls Atomic Power Lab*, 461 F.3d 134, 140-41 (2d Cir. 2006)) (internal quotation marks omitted).

       b. <u>Application</u>

       Defendant does not dispute the first two elements of plaintiff's *prima facie* case, namely, that plaintiff is a member of a protected class, and that, on and after March 1, 2017, the relevant statutory period for plaintiff's Title VII claims, or November 21, 2015  for plaintiff's NYSHRL and NYCHRL claims, plaintiff was qualified to hold the position that she held. (ECF No. 33, Def. Mem. at 7.)  Defendant disputes, however, that plaintiff was subjected to a material adverse employment action, and that defendant had discriminatory intent.  (*Id.*)  For the reasons set forth below, the court agrees with defendant and finds that plaintiff has not established that she was subjected to a material adverse employment action and, accordingly, grants summary judgment for defendant as to plaintiff's discrimination claims.

<u>Continuing Violation Doctrine</u>

       Unless plaintiff can establish a continuing violation, plaintiff's factual allegations predating March 1, 2017 will be considered time-barred.  "Title VII requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment

agency, within 300 days of the alleged discriminatory action."
*Van Zant v. KLM Roya Dutch Airlines*, 80 F.3d 708, 712 (2d Cir.
1996); 42 U.S.C. § 2000e-5(e).

This statutory requirement is analogous to a statute
of limitations. *Van Zant*, 80 F.3d at 712 (citation omitted).
Unless an exception applies, courts in the Second Circuit
consider only events that occurred during the 300-day period
prior to filing of the EEOC complaint.  Because plaintiff filed
her EEOC complaint on December 27, 2017, any events prior to
March 1, 2017 are generally deemed time-barred for purposes of
Title VII.  *Id.; Taylor v. City of N.Y.*, 207 F. Supp. 3d 292,
300 (S.D.N.Y. 2016) (finding that "[f]or a Title VII claim to be
timely, the alleged discriminatory conduct must have occurred
less than 300 days prior to the filing of the EEOC charge").

The bulk of plaintiff's suit relates to events that
occurred before March 1, 2017, and plaintiff asserts that the
court should consider predating events under the "continuing
violation" doctrine.  The continuing violation doctrine will
permit a court to consider conduct outside of the 300-day
limitations period, where plaintiff shows evidence of
defendant's "continuous practice and policy of discrimination,"
such as discriminatory seniority lists or employment tests.  *Van
Zant*, at 713.  Discrete incidents of discrimination that are not
the result of a discriminatory policy or practice will not

25

ordinarily amount to a continuing violation. *Cornwell*, 23 F.3d at 703; *Rowe v. New York State Dep't of Tax. & Fin.*, 786 F. App'x 302, 304 (2d Cir. 2019) (finding that multiple alleged failures to promote were "a series of discrete acts of retaliation and discrimination" that were time-barred). To amount to a discriminatory policy or practice, there must be evidence that "specific [] instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.*

Here, plaintiff's assertion that there was a continuing violation is unavailing. Plaintiff has not shown a connection between the Hospital's treatment of her and any company policy or practice, nor that the Hospital allowed incidents of discrimination to go unremedied; to the contrary, the Hospital took prompt action in response to plaintiff's complaint. (ECF No. 36-13, Ex. K.) Even if the court were to consider the Hospital's conduct that occurred before March 2017, the court would still conclude that plaintiff has failed to identify probative, admissible evidence from which a reasonable factfinder could find in her favor. *Anderson*, 477 U.S. at 256-57.

Plaintiff Has Not Shown an Actionable Failure to Promote

Plaintiff asserts that she "was appointed to a less distinguished title than comparator employees [and suffered]

26

pecuniary detriment accompanying that failure." (Opp. Mem. at
9.) Even though plaintiff did not actually plead a failure to
promote claim in her amended complaint, plaintiff attempts to
argue that she suffered "the adverse action of a failure to
promote by receiving a position and salary lower than the one
advocated for." (Opp. Mem. at 9.) For the reasons set forth
below, the court finds that plaintiff has adduced no facts
substantiating a claim for failure to promote.

From March 1, 2017 until plaintiff's voluntary
resignation in May 2018, plaintiff held the position of CNM and
earned an annual salary of $120,000 to $123,600.[5] Plaintiff's
failure to promote allegations in the briefs, which were not
included in the amended complaint, concern conduct wholly
outside of the relevant time period, and are not properly
considered. Even if plaintiff had successfully argued that the
court's consideration of events and evidence outside the
limitations period was warranted, the court would find no
material – or *any* - adverse employment action here under Title
VII, the NYSHRL or the NYCHRL.

Though plaintiff attempts to cast her unsuccessful job
interview for the CNM position, in April 2015, as an adverse
employment action, plaintiff has not established or explained

---

[5] Plaintiff received a 3% general wage increase in 2017. (56.1 Resp. ¶ 77.)

how she was entitled to be promoted to CNM in April 2015.  (JA,
Ex. G, at 176:18-20 ("[CNO Scher] refuse [sic] to give me the
title and the salary that I deserved.").

In evaluating a discriminatory failure to promote
claim, courts in the Second Circuit evaluate whether the
plaintiff has established a *prime facie* case that plaintiff (1)
belongs to a protected class; (2) sought or was eligible for
promotion to positions to which the employer was seeking to
promote people; (3) plaintiff was not promoted; and (4) the
employer promoted others less qualified for the position than
plaintiff.  *Gonzalez v. City of New York*, 354 F. Supp. 2d 327,
334 (S.D.N.Y. 2005).

Here, plaintiff has plainly not met her evidentiary
burden.  Specifically, plaintiff has not identified any
successful candidates for promotion or hire to the CNM position,
outside of plaintiff's protected group, who were similarly
situated to plaintiff in all material respects.  The undisputed
evidence establishes that all three individuals who were hired
as CNMs in the ED or the ICU, around the time that plaintiff
pursued the CNM position, had years of supervisory experience
prior to being hired by the Hospital into management positions.
(56.1 Resp. ¶ 47.)

First, Robert Pryce, who was hired in 2014 by Ms.
Kanevsky as a CNM in the ICU, had held a nursing management role

28

for three to four years at another hospital before joining JHMC. (ECF No. 33-2, Pryce Decl. ¶ 7.) Second, Alicia McCaskie had also held a nursing management role prior to joining JHMC as a CNM in the ED. (*Id.*) Third, Diahann Singh had held "a wealth of leadership roles, and she had been a . . . nurse leader at Rikers, which [is] a pretty tough population[.]" (JA, Ex. E, 76:7-16.) Ms. Singh had also been employed previously as a team lead, as a supervisor, and a director. (*Id.* at 76:17-20.) In contrast to Mr. Pryce, Ms. McCaskie, and Ms. Singh, plaintiff had limited supervisory experience in her role as a staff nurse. (56.1 Resp. ¶ 36.)

As courts within the Second Circuit have noted, "[w]ith regard to the positions filled by lateral employees who formerly held . . . equivalent positions, . . . [t]he employment experience of those [lateral] candidates forecloses the argument that they were similarly situated to [plaintiff] 'in all material respects.'" *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 405 (S.D.N.Y. 2017); *Graham*, 230 F.3d at 39; *Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005) (dismissing failure to promote claims where plaintiffs could not demonstrate that employees promoted in their place were less qualified than plaintiffs).

As noted above, plaintiff's comparators were *more* qualified, not less so, than plaintiff. Moreover, plaintiff

altogether fails to address her relative lack of managerial experience compared with that of the other CNMs, nor does she cite any evidence in the record that she was qualified, as of April 2015, to be promoted to CNM.  As defendant correctly notes, plaintiff has cited no legal authority or evidence other than her own ipse dixit, given the disparity in experience and qualifications between herself and the other CNMs, that she was nonetheless qualified and entitled to be promoted to CNM. (Reply Mem. at 6.)  "Mere requests for consideration for promotion or general expressions of interest over time do not suffice," and nor does the fact that plaintiff was a longtime employee at the Hospital entitle her to the requested promotion in April 2015.  *Inguanzo v. Hous. & Servs., Inc.*, 2014 U.S. Dist. LEXIS 132197, at *36 (S.D.N.Y. Sept. 19, 2014). Plaintiff's failure to promote claim thus fails on its face. *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009).

Plaintiff also asserts that she should have been paid more than $120,000 when she was promoted to CNM: "[My salary] should have been more.  It should have been . . . whatever they had owed me, should have been plus, plus the three percent. . . . [T]hey should have given me all those three percents." (JA, Ex. G, at 125:2-12.)  As best as the court can discern, plaintiff apparently asserts that she was "owed" the annual 3%

wage increase from 2015 to 2017, on the theory that she was entitled to be promoted to CNM in April 2015.  As discussed above, this argument fails on its face because plaintiff was not entitled to a promotion.  Moreover, plaintiff's starting salary of $120,000 was commensurate with her experience and the CNM position.

Specifically, some CNMs were paid "considerably less" than plaintiff, while others were paid a bit more.  (ECF No. 33-16, Ex. M; JA, Ex. E, 72:20-73:21; 76:3-25.)  Specifically, Ms. Cornet, the Vice President of HR, testified that "[t]here were other nurse managers who had been [with the Hospital] a long time as nurse managers and they weren't making even 116 [thousand]."  (JA, Ex. E, 72:20-73:21.)  Plaintiff's starting salary of $120,000 was exactly what two other nurse managers, Mr. Pryce and Ms. McCaskie, made.  (JA, Ex. G, 119:14-15.)  Plaintiff acknowledged at her deposition that she understood that the overnight ED nurse manager, Ms. Singh, was compensated at a slight premium ($125,000) because the it was a less desirable shift.  (JA, Ex. G, 119:3-20 ("Diane [Singh] started with 125 [thousand], which is okay because you know what, they paid her because she's the overnight."); *see also* JA, Ex. E, 49:2-17 ("[I]t's more difficult to attract professional level staff to work evenings and nights.").)

For the foregoing reasons, the court finds that
plaintiff has failed to create a triable issue of fact as to the
failure to promote claim under federal, state and local law.

No Evidence That Plaintiff Has Suffered a Material Adverse
Employment Action

"Examples of materially adverse employment actions
include termination of employment, a demotion evidenced by a
decrease in wage or salary, a less distinguished title, a
material loss of benefits, significant diminished material
responsibilities, or other indices unique to a particular
situation." *Hui-Wen Chang v. N.Y.C. Dep't. of Educ.*, 2019 U.S.
Dist. LEXIS 167955, at *26 (E.D.N.Y. Sept. 27, 2019) (KAM)
(internal quotations omitted).  By contrast, "a promotion to a
more important title with an increase in salary is the exact
opposite of the quintessential adverse employment actions
described by the Second Circuit[.]" *Paul v. Postgraduate Ctr.
for Mental Health*, 97 F. Supp. 3d 141, 192 (E.D.N.Y. 2015).

Plaintiff has not alleged or adduced admissible
evidence that defendant undertook any materially adverse
employment action against plaintiff during her employment.  (*See
generally* JA, Ex. G, 97:19-20 (alleging that CNO Scher did not
greet plaintiff and failed to publicly show appreciation or
acknowledge plaintiff at meetings); ECF No. 7, Am. Compl. ¶ 27
(alleging that various individuals referred to plaintiff as a

32

"black Haitian"), ¶ 29 (alleging that an employee spoke to plaintiff in a "demeaning manner before hanging up the phone on her"); ¶ 44 (alleging that CNO Scher called plaintiff and another employee "not approachable" at a work meeting).) Plaintiff apparently contends that plaintiff was subjected to adverse action because defendant "constructively discharged [plaintiff] due to its discriminatory treatment rising to the level of a material adverse action." (Opp. Mem. at 8-9.)

The court finds that none of the foregoing or following purported actions by defendant constitute materially adverse employment actions. Namely, in addition to the foregoing, plaintiff asserts the following were also adverse employment actions: 1) being required to wear scrubs while at work, and 2) being short-staffed. Plaintiff did not cite to any legal authority or other support for these assertions, and the court has not found support for these propositions in the case law.

First, plaintiff asserts that being required to wear scrubs at work constituted an adverse employment action. The court disagrees. Plaintiff alleged in her amended complaint that Ms. Kanevsky "authorized" plaintiff to wear regular clothing rather than scrubs "like the other Clinical Nurse Managers." (Am. Compl. ¶ 23.) However, CNO Scher allegedly instructed plaintiff and Ms. Kanevsky to wear scrubs while

working in the ED.  When plaintiff asked CNO Scher why she was
required to wear scrubs, CNO Scher allegedly responded, "This is
not a fashion show."  (*Id.*; ECF No. 36-4, Ex. B, 94:9-97:8.)

As defendant notes, plaintiff does not explain how
being required to wear scrubs at work materially or adversely
affected her employment.  (Reply Mem. at 4.)  Courts in the
Second Circuit have found that being asked to comply with an
employer's dress code is generally not considered an adverse
employment action.  *See, e.g.*, *Brooks v. City of Utica*, 275 F.
Supp. 3d 370, 378 (N.D.N.Y. 2017) (being required to wear a hat
and hairnet while on duty is not an adverse employment action).
Even an employer's threat to discipline or terminate an employee
for her refusal to comply with hygiene and dress code norms does
not constitute an adverse employment action.  *Id.* at 377-78
(collecting cases).  At most, JHMC's requirement that plaintiff
wear scrubs while on duty, as a nurse in the ED, was a "'minor
inconvenience,' which does not amount to a materially adverse
employment action." *Givens v. Monroe Cty.*, 11-CV-6592 (MAT),
2014 WL 4794641, at *5 (W.D.N.Y. Sept. 25, 2014) (granting
summary judgment for defendant where plaintiff was asked to
remove a sweatshirt that was not in compliance with the dress
code).

In addition, plaintiff does not assert that she was
unable to perform her job effectively in scrubs, as opposed to

34

other attire. (*Id.*) To the contrary, as Mrs. Cornet testified at her deposition, the reason that CNO Scher asked plaintiff to wear scrubs was "because [the ED was] tremendously short staffed, continue to be short staffed, and [plaintiff] needed to be ready to jump in the case of a trauma call, and high heel shoes in a busy ED weren't going to be able to be responsive." (JA, Ex. E, at 62:21-63:7.) Furthermore, Mr. Pryce averred in his sworn declaration that he observed plaintiff as well as other CNMs wearing both street clothes and scrubs at work. Mr. Pryce stated that he "usually" wore scrubs "because it allows [him] to jump in for patient care when we are short-staffed, which is often." (ECF No. 33-2, Pryce Decl. ¶ 14.) Indeed, Ms. Kanevsky asked plaintiff to perform bedside care, staff nurse duties, charge nurse duties, push stretchers, triage, and provide relief when others went on break, in the ED. (56.1 Resp. ¶ 78.) The court also notes that there is no evidence that plaintiff was singled out with the dress code requirement; by plaintiff's own admission, Ms. Kanevsky, Director of Nursing in the ED, was also required to wear scrubs at work. (JA, Ex. G, at 94:11-14; *Givens*, 2014 WL 4794641, at *5 (noting that plaintiff was not treated differently than another worker with respect to the dress code).) Plaintiff has not presented evidence of similarly situated employees who were not required to wear scrubs. Thus, the court finds that plaintiff's being

35

required to wear scrubs does not constitute a materially adverse
employment action.

Second, plaintiff asserts, in conclusory fashion and
without citing legal authority, that being short-staffed was an
adverse employment action.  (Opp. Mem. at 10.)  Plaintiff
evidently assumes, without a factual basis, that other CNMs who
worked different shifts were more adequately staffed, that this
was a purposeful effort to undermine her, and was thus evidence
of an adverse employment action.  The court finds that it was
not.

Plaintiff's argument that she was uniquely
understaffed is belied by her own testimony, in which she
acknowledged that other CNMs were also understaffed.  (JA, Ex.
G, at 154:3-7.)  The undisputed evidence confirms that staff
shortages were experienced not only by plaintiff, but by the
entire ED and ICU departments.  For example, plaintiff's husband
testified that he and others in the ICU department complained of
the staff shortage in the ICU.  (JA, Ex. D, 60:20-61:9.)  Mr.
Pryce further confirmed that he "often" experiences staff
shortages.  (Pryce Decl. ¶ 14.)  Ms. Kanevsky also testified
that, as Nursing Director, she asked "all managers" if they
could work extra hours.  (JA, Ex. A, at 26:13-24.)

In addition, the Hospital's staff shortage issue was
not a "change" in the conditions of plaintiff's employment after

March 2017.  As Ms. Kanevsky testified, a serious staff shortage existed at least as far back as 2015, when plaintiff worked as a CNC.  (*Id.*)  Based on the totality of the undisputed evidence before the court, the court finds that the staff shortage that plaintiff experienced was neither unique to her nor a materially adverse employment action.

Plaintiff Has Not Established Constructive Discharge

Plaintiff has not made a *prima facie* showing of constructive discharge.[6]  The Second Circuit has observed that an "employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003).  "[T]o state a prima facie case of constructive discharge, [a plaintiff] must establish that the constructive discharge 'occurred in circumstances giving rise to an inference of discrimination on the basis of [plaintiff's] membership in [a protected] class.'"  *Id.* (citation omitted).  "Constructive discharge claims face a demanding standard, even higher than

---

[6] Though plaintiff did not plead constructive discharge as a separate cause of action in her Amended Complaint (*see generally* ECF No. 7, Am. Compl.), both parties briefed this issue in connection with defendant's motion for summary judgment.  Plaintiff apparently contends that she was constructively discharged, "giving rise to the level of a material adverse action," for purposes of her discrimination claims.  Thus, the court has considered whether plaintiff has adduced evidence of a *prima facie* discrimination claim, under a constructive discharge theory.  (Opp. Mem. at 21.)

that required to prevail on a hostile environment claim.").
*Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 262 (S.D.N.Y.
2014). For instance, constructive discharge claims "cannot be
proven merely by evidence that an employee preferred not to
continue working for that employer . . . [or that] the
employee's conditions were difficult or unpleasant[.]" *Edwards
v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 213
(E.D.N.Y. 2013). Further, constructive discharge claims are
measured by an objective reasonable person standard. *Petrosino*,
384 F.3d at 230 (2d Cir. 2004).

It is undisputed that, on May 25, 2018, the day that
plaintiff handed in her pre-written resignation letter to JHMC,
plaintiff had not set foot in the Hospital for the previous six
months, nor had any supervisors from JHMC contacted her.[7] (56.1
Resp. ¶ 85.) Furthermore, on May 25, 2018, plaintiff did not
meet with or encounter CNO Scher or any other supervisors. (*Id.*
¶¶ 91-92.) In addition, plaintiff has not pointed to any facts
showing that, during the months leading up to plaintiff's
medical leave, defendant ratcheted up the purportedly
intolerable working conditions. The undisputed evidence
establishes that plaintiff began working for a different

---

[7] As plaintiff acknowledges, "while [plaintiff] was on medical leave, just
after submission of [her and Ms. Kanevsky's complaints to Human Resources],
Ms. Perard was unable to experience any further adverse action while she was
not attending work." (Opp. Mem. at 22.)

employer the week following her resignation, where plaintiff made a higher salary, $130,000, and again reported to Ms. Kanevsky, with whom she had a positive working relationship during their employment by defendant.  (*Id.* ¶¶ 93, 96.)

At most, plaintiff has put forth evidence showing that she merely preferred not to continue working at JHMC, which is insufficient to meet the "demanding" standard required to sustain a constructive discharge claim.  *Edwards*, 957 F. Supp. 2d at 213; *Pryor*, 992 F. Supp. 2d at 262.  There is no evidence in the record that supports plaintiff's claim that she was constructively discharged due to her working conditions having deteriorated to an objectively intolerable level.  *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003).

For the foregoing reasons, the court grants defendant summary judgment as to plaintiff's federal and state discrimination claims, and plaintiff's NYCHRL retaliation claim.

## II.  Plaintiff's Hostile Work Environment Claims under Title VII and NYSHRL Fail

As noted above, alleged conduct that took place prior to March 1, 2017 is time-barred under Title VII, and alleged conduct that occurred before November 21, 2015 is time-barred under NYSHRL and NYCHRL because plaintiff has not established a continuing violation.  *Rowe*, 2019 WL 4463567, at *2.

a. <u>Legal Standard</u>

39

To make out a hostile work environment claim, plaintiff must establish, based on both an objective and a subjective standard, "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino v. Bell Atl.*, 384 F.3d 210, 221, 230 (2d Cir. 2004) (internal quotation marks omitted). Courts reviewing claims for hostile work environment "consider the totality of the circumstances, including '(1) the frequency of the conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.'" *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 152 (E.D.N.Y. 2002) (citing *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437 (2d Cir. 2002)). The incidents at issue must be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 240 (E.D.N.Y. 2015) (citing *Das v. Consolidated School Dist. of New Britain*, 369 F. App'x 186, 190 (2d Cir. 2010)).

40

Furthermore, the alleged incidents or comments must be "severe." *See, e.g.*, *Fleurentin v. New York City Health and Hosps. Corp.*, 18-CV-5004 (AMD)(RLM), 2020 WL 42841, at *8 (E.D.N.Y. Jan. 3, 2020) (finding that refusing to let employee play Santa Claus at a holiday event due to employee's accent was not severe enough to support a hostile work environment claim). "In other words, '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 350 (E.D.N.Y. 2008) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). "[U]nder the law, an unpleasant work environment does not amount to a hostile one." *Mauze v. CBS Corp.*, 340 F. Supp. 3d 186, 214 (E.D.N.Y. 2018).

    b. Application

    Though it is undisputed that plaintiff subjectively viewed her working environment as a hostile one, plaintiff has cited no legal authority that plaintiff experienced an objectively hostile work environment.  As defendant notes, plaintiff cites nothing more than mostly undated, discrete acts that amount to nothing more than minor or perceived slights, or unpleasant comments.  Nor has plaintiff substantiated that the conduct alleged unreasonably interfered with plaintiff's work. *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir.

41

2015).  Taken individually or in the aggregate, none of the
conduct alleged is sufficiently severe or pervasive to give rise
to a hostile work environment claim.  Accordingly, the court
grants defendant summary judgment as to plaintiff's federal and
state hostile work environment claims.

At plaintiff's deposition, she testified, in
conclusory fashion, that CNO Scher "created a hostile
environment for me along with her crew" and that she has been
"tortured . . . for all these years" because CNO Scher made
plaintiff's life a "living hell."  (ECF No. 36-4, at 68:12-22;
69:2-6.)  Plaintiff recounted that CNO Scher would sometimes
call her into her office, with Robin Blackwell and Sharon
Narducci, in order to "bash" plaintiff.  (*Id.* at 69:7-18.)
Plaintiff also testified that, during the few times CNO Scher
crossed paths with the ED staff, CNO Scher did not greet
plaintiff.  (*Id.* at 97:13-21; 144:17-25.)  In addition, on July
13, 2016, CNO Scher conducted a meeting in which she solicited
managers' opinions and experiences, and allegedly skipped over
plaintiff and Ms. Kanevsky.  (ECF No. 36-4, at 99:14-24.)
Plaintiff noted that CNO Scher skipped over Ms. Kanevsky and
plaintiff, without soliciting their opinions regarding a work
matter.  In summary, plaintiff testified that she believed CNO
Scher was discriminating against her: "She singled me out.
Whatever I do, she will always find something to target me.  She

would call me black Haitian.  She would have her crew pick on me, belittle me as well."  (*Id.* at 176:12-18.)

The court has considered the totality of the circumstances, including discrete comments made by employees at JHMC, and concludes that they were not severe or pervasive, and did not create a hostile work environment.  For example, Ms. Blackwell allegedly referred to plaintiff as incompetent: "Oh, she doesn't know what she is doing. This is not Haiti."  (JA, Ex. A, at 73:5-11.)  Comments regarding a plaintiff's incompetence at her job, however, are not necessarily related to discrimination and are thus not actionable without a nexus to discriminatory animus.  *See Golston-Green v. City of New York*, 123 N.Y.S.2d 656 (2d Dep't 2020) (affirming summary judgment for defendant on NYSHRL hostile work environment claim where boss referred to plaintiff as a "Sergeant do nothing" and "an empty suit" and was told she needed to "do [her] job").  Moreover, Ms. Blackwell was not plaintiff's supervisor, and there is no evidence that she had the ability to affect the terms of plaintiff's employment.

Plaintiff also alleged that Ms. Blackwell and CNO Scher referred to plaintiff's accent and stated that they were not able to understand her.  (JA, Ex. A, 76:3-19.)  CNO Scher referred to plaintiff's thick accent, and asked Ms. Kanevsky, plaintiff's direct supervisor, whether she could understand

43

plaintiff.  (JA, Ex. A, 15:21-24; *see also* JA, Ex. G, 50:23-25; 51:23.)  Plaintiff also testified at her deposition that, during her 2015 interview with CNO Scher for the CNM position, CNO Scher spent the bulk of the 30 to 45 minutes repeatedly stating that plaintiff was black and Haitian and that her accent was difficult to understand.  (JA, Ex. G, 47:19-25 ("[CNO Scher] would stop me from time to time when I was talking to her, complaining about my accent.  That she's having difficulty understanding me."), 48:20-49:18, 50:23-51:2.)[8]

Evidence that employees in a supervisory role referenced plaintiff's accent and difficulty in understanding plaintiff is generally insufficient to establish discriminatory animus.  *Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 472, 478 n.36 (S.D.N.Y. 2008) (granting defendant summary judgment even though supervisor "mocked [plaintiff's] accent by mimicking her pronunciation of various words and phrases" because "there [was] no record evidence that her accent was the basis for an adverse employment action"); *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, 00-CV-2574 (JSM), 2002 WL 826877, at *10 (S.D.N.Y. Apr. 30, 2002) ("That [the supervisor] said that she could not understand [plaintiff's] accent does not support a claim of discrimination."), *aff'd*, 56 F. App'x 12 (2d Cir. 2003) (summary

---

[8] Plaintiff further testified that CNO Scher did "not really" ask plaintiff about her qualifications and experience for the desired position because she was "more focused on my race."  (*Id.* at 50:14-18, 52:12-25, 53:2-14.)

order); *Kho v. New York and Presbyterian Hosp.*, 344 F. Supp. 3d 705, 719-20 (S.D.N.Y. 2018) (granting defendant summary judgment where criticism regarding plaintiff's Chinese accent were in the context of performance reviews and her language skills were reasonably related to her job performance); *Grant v. Cont'l Cas. Co.*, No. 13-CV-5675 (AT), 2015 WL 1499724, at *8 (S.D.N.Y. Mar. 30, 2015) (plaintiff failed to show discriminatory motive where supervisor remarked, "I don't understand you, you're not being clear," because such remarks were "devoid of direct or even oblique reference to race or national origin"). Further, there is no evidence that any employees used racial slurs or epithets regarding plaintiff. *Holt v. Roadway Package Sys., Inc.*, 506 F. Supp. 2d 194, 201 (W.D.N.Y. 2007). Plaintiff describes herself as black and Haitian, which were the only allegedly offensive terms used in reference to plaintiff. (JA, Ex. A, 70:2-9; JA, Ex. G, 10:17-25, 16:15-16.)[9]

---

[9] The stray remarks regarding plaintiff's accent are insufficient to sustain plaintiff's discrimination claim. Even if plaintiff's supervisor's comments regarding her accent or in reference to her race and/or national origin reflected a discriminatory animus, there is no evidence that plaintiff suffered an adverse employment action to which the comment could have related; thus, summary judgment is warranted here. *See Manko*, 554 F. Supp. 2d at 478 n.36 (S.D.N.Y. 2008); *Tomizawa v. ADT LLC*, 2015 U.S. Dist. LEXIS 133649, at *34 (E.D.N.Y. July 17, 2015) (Bloom, M.J.), *adopted at* 2015 U.S. Dist. LEXIS 132182 (E.D.N.Y. Sept. 29, 2015) (Brodie, J.) ("[S]tray remarks, even by a decisionmaker, without a demonstrated nexus to the adverse action will not defeat a motion for summary judgment."); *Brown v. AstraZeneca Pharms., L.P.*, 2006 U.S. Dist. LEXIS 57377 (E.D.N.Y. 2006) ("Racist comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the [adverse action].").

During her deposition, plaintiff added to her account of her 2015 interview with CNO Scher, that CNO Scher told plaintiff, point-blank, "I don't like black people." (JA, Ex. G, at 58:13-14.)  Plaintiff further testified that Robert Pryce, a CNM who identifies as black, told her that CNO Scher said she didn't like black people or black Haitians. (*Id.* at 61:2-4.) Mr. Pryce has disputed the veracity of plaintiff's testimony regarding this alleged remark by CNO Scher in his sworn declaration, which was submitted in connection with the defense motion for summary judgment.[10]  In any event, even if CNO Scher's alleged inadmissible hearsay statement to Mr. Pryce was made, the court finds that this disparity between plaintiff's and Mr. Pryce's testimony fails to create a material factual dispute because the court finds no adverse employment action occurred, and this alleged comment was not sufficiently severe or pervasive to sustain plaintiff's federal or state hostile work environment claims.

"To prove a hostile work environment claim . . ., a plaintiff must show that [her] 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the

---

[10] Specifically, Mr. Pryce declared that plaintiff's allegation regarding a conversation between them in July 2016, in which Mr. Pryce allegedly told her that CNO Scher doesn't like black Haitians never happened, and he "would never have said such a thing." (ECF No. 33-2, Pryce Decl. ¶ 13.)

victim's employment and create an abusive working environment.'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Having considered the evidence before the court in the light most favorable to the non-moving party, and based on the totality of the circumstances, plaintiff has not demonstrated a sufficiently hostile and pervasive environment.  Accordingly, defendant is entitled to summary judgment on plaintiff's federal and state hostile work environment claims.

### III. Plaintiff's Retaliation Claims under Title VII, NYSHRL and NYCHRL Fail

Defendant also contends that plaintiff has failed to establish a *prima facie* case of retaliation under Title VII, NYSHRL and NYCHRL because plaintiff cannot show that she engaged in a protected activity, defendant was aware of the protected activity, and the existence of a causal connection between plaintiff's protected activity and the materially adverse action.  (Def. Mem. at 12.)  For the reasons set forth below, the court agrees with defendant and grants summary judgment for defendant on plaintiff's federal and state retaliation claims.

a. Legal Standard

According to the United States Supreme Court, the federal anti-retaliation statute "seeks to secure that primary objective [of] preventing an employer from interfering (through

47

retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). As with discrimination claims, federal and state retaliation claims are governed by the *McDonnell Douglas* framework. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

To establish a *prima facie* case of retaliation under state and federal law, a plaintiff must show (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Id.* at 844. Once the plaintiff makes a *prima facie* showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action. *Id.* at 845 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). After a non-retaliatory reason has been articulated, the presumption of retaliation drops, and the plaintiff must then demonstrate the non-retaliatory reason is a mere pretext for retaliation. (*Id.*)

A plaintiff "alleging retaliation in violation of Title VII [and NYSHRL] must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360

(2013)).  This does not require proof that retaliation was the only cause for the employer's action, but that the adverse action would not have occurred absent the retaliatory motive. *Id.* at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Id.*

For retaliation claims a broader range of conduct may be actionable than for discrimination claims.  Unlike the discrimination provision, the antiretaliation provision of Title VII is not limited to discriminatory actions that affect the terms and conditions of employment.  *Burlington*, 548 U.S. at 63.  Courts properly assess "whether the actions of an employer could dissuade a reasonable worker from making a charge of discrimination."  *Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 302 (E.D.N.Y. 2016).

"The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).  "[E]mployer actions prohibited by Title VII's anti-

49

discrimination provision are limited to conduct that affects the terms and conditions of employment, while under Title VII's anti-retaliation provision, the challenged action need not affect the terms and condition of employment in order to constitute unlawful retaliation." *Siddiqi v. New York City Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-64 (2006)).

"NYCHRL's retaliation provision is broader than Title VII's[,] protecting plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action.'" *Id.* at 76 (citing *Mihalik*, 715 F.3d at 112). "While the NYCHRL has a less demanding standard [for retaliation], a 'plaintiff still must establish that there was a causal connection between [her] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [her] termination was pretextual or motivated at least in part by an impermissible motive.'" *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (citation omitted).

   b. Application

The court finds that plaintiff's retaliation claims founder on element three: plaintiff has failed to adduce

evidence showing any material adverse action by defendant against plaintiff. Accordingly, the court grants defendant summary judgment with respect to plaintiff's federal and state retaliation claims.

First, it is largely undisputed that plaintiff's filing of an EEOC complaint on December 27, 2017 constitutes a protected activity for purposes of Title VII. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law," the filing of a complaint qualifies as protected activity under Title VII). Further, there is no dispute as to whether plaintiff filed her EEOC complaint in good faith. The court thus considers plaintiff to have satisfied the first element of a *prima facie* retaliation claim.

Plaintiff also asserts that she engaged in two other protected activities: her delivery of a letter dated July 19, 2016 to defendant's C-suite, complaining of unfair practices directed toward the Emergency Department and her title, but not based on her race or national origin, and her support of Ms. Kanevsky's HR complaint. (Pl. Mem. at 19.) The court finds

that defendant does not meaningfully dispute that plaintiff has engaged in one or more protected activities.[11]

Based on the totality of the undisputed facts in evidence, however, plaintiff has not shown that the Hospital took *any* adverse action against plaintiff following any protected activity.  To the contrary, approximately four months after plaintiff complained to HR in July 2016, plaintiff received her second promotion in less than two years.  (ECF No. 33-13, Ex. J; ECF No. 33-16, Ex. M.)

Crucially, as noted above, plaintiff fails to explain or cite any case law in support of her assertion that plaintiff's decision to voluntarily resign from the Hospital immediately upon her return from medical leave was tantamount to an adverse action *by the Hospital*.  Additionally, as the court has earlier found, plaintiff was not constructively discharged by defendant.  Plaintiff's subjective belief, unsupported by facts in the record, that "it was not going to be good" for her if she stayed with the Hospital, does not, as plaintiff suggests, establish her reasonable concern that plaintiff would

---

[11] As defendant accurately notes, however, plaintiff's 2016 letter made no reference to discrimination she personally experienced, on the basis of any protected category, and it was not regarded as a racial discrimination complaint by the Human Resources VP, Ms. Cornet.  (ECF No. 36-10.)  Ms. Cornet testified at her deposition that she understood plaintiff's grievances to concern CNO Scher's allegedly poor treatment of the entire ED team, and plaintiff's separate request that her title be changed to "manager" instead of "coordinator."  (ECF No. 33-8, Ex. E, 39:7-40:10.)

be terminated by the Hospital.  (JA, Ex. G, 190.)  Though plaintiff alleges that unidentified staff members advised plaintiff not to stay at the Hospital because "they might kick you out," (ECF No. 36-4, Ex. B, at 187:2-16), plaintiff has cited no case law in support of her apparent assertion that unsubstantiated rumors of a future adverse action are tantamount to an adverse action *by the Hospital*.

For the foregoing reasons, the court finds that plaintiff has adduced insufficient evidence to raise a triable issue of fact regarding any retaliation as a result of plaintiff's protected activities.  Defendant is thus entitled to summary judgment on plaintiff's local, state and federal retaliation claims.

## IV.  Plaintiff's Discrimination and Hostile Work Environment Claims under the NYCHRL

### a. Legal Standard

The NYCHRL makes it "unlawful for an employer or an employee or agent thereof" to discharge an employee based on, *inter alia*, the employee's race or national origin.  N.Y.C. Admin. Code § 8-107(1)(a).  It is also unlawful to discriminate against such person in "terms, conditions or privileges of employment."  *Id.*  Under the NYCHRL, "an employer is strictly liable for the unlawful harassment of employees by their supervisors or managers, regardless of whether the harassment

53

culminates in a tangible employment action." *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 657, 658 (E.D.N.Y. 2015); *Golston-Green*, 123 N.Y.S.2d at 670 (noting that under the NYCHRL, "a court should award summary judgment dismissing a cause of action alleging a hostile work environment only if it can be said, as a matter of law, that the conduct complained of was 'truly insubstantial' and cannot be said to fall within 'the broad range of conduct . . . between severe or pervasive on the one hand and a petty slight or trivial inconvenience on the other.'") (internal quotation marks and citation omitted); *Williams v. New York City Housing Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009).  Notably, to sustain a discrimination claim under the NYCHRL, plaintiff need not establish a materially adverse employment action.  *Mihalik*, 715 F.3d at 114.

"Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd,* 713 F.3d 163 (2d Cir. 2013).  "Under the NYCHRL, defendants' discriminatory conduct need not be severe or pervasive to create an actionable hostile work environment[;]" rather, the relevant question is "whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of her race [or] national origin."  *Id.* (citation and internal quotation marks omitted);

54

*see also Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 340 (S.D.N.Y. 2010). Questions of severity and pervasiveness go to the scope of permissible damages, not to liability. *Kaur*, 688 F. Supp. 2d at 340 (citation omitted). Defendants can avoid liability for a hostile work environment claim under the NYCHRL by proving that the conduct complained of "consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Id.* (citation and internal quotation marks omitted); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd,* 713 F.3d 163 (2d Cir. 2013); *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450 (E.D.N.Y. 2013).

Although the NYCHRL was formerly construed to be coextensive with its federal and state counterparts, the law was amended in 2005 and requires an independent analysis. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Courts must construe the NYCHRL's provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible[.]" *Id.* (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011)). "[E]ven if the challenged conduct is not actionable under federal and state law, federal courts must consider separately

whether it is actionable under the broader New York City standards." *Id.*

Courts should consider the totality of the circumstances "because the overall context in which the challenged conduct occurs cannot be ignored." *Id.* at 113 (citation and internal quotation marks omitted). The NYCHRL is not a general civility code, however, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives. *Id.* (citations omitted). Although a court may still dismiss truly insubstantial cases, even a single comment may be actionable in the proper context. *Id.* (citation omitted).

"New York courts seeking to heed the [broad construction] command have approached discrimination and retaliation claims under a similar framework. In both situations, the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75–76 (2d Cir. 2015). "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's 'reasons were pretextual,' . . . or that the defendant's stated reasons were not its sole basis for taking action, and that its

conduct was based at least 'in part on discrimination[.]'" *Id.*
(citations omitted).

       b. Application

      Applying the framework of the NYCHRL, the court finds
that plaintiff *has* created a triable issue of fact as to whether
she was treated less well than other employees, at least in part
for a discriminatory reason.  In general, however, the court
finds that evidence of a hostile work environment is scant.

      Plaintiff has proffered evidence of a few, discrete
comments from various employees – Ms. Iavino, Ms. Blackwell, and
CNO Scher – accurately stating that plaintiff is black and
Haitian, but not using slurs or referring to plaintiff in a
degrading, racial manner.[12]  Plaintiff also subjectively took
offense because CNO Scher did not solicit her or Ms. Kanevsky's
opinions regarding a work issue, at one work meeting.  (ECF No.
36-4, at 99:14-24.)  Plaintiff states that she felt
"uncomfortable" during a meeting at which comments were made
about another nurse, Poliak, who spoke English as a second
language.[13]  (Opp. Mem. at 20.)  The record also contains

---

[12] It appears that only CNO Scher exercised supervisory authority over
plaintiff, and plaintiff has not shown a specific basis for imputing Ms.
Iavino's or Ms. Blackwell's conduct to the employer, or shown whether
defendant was aware of the other employees' conduct.  *Petrosino*, 384 F.3d at
221, 230.
[13] Plaintiff's brief failed to cite to the record, and the court cannot
discern who made the comment, when, or about whom, and the court is not
obligated to hunt for plaintiff's evidence.  *Giannullo*, 322 F.3d at 140.

references to disparaging comments allegedly made about another nurse, "Irina."  Plaintiff has failed to explain or cite legal support as to why such comments, about other nurses, would be relevant to establishing *plaintiff's* racial hostile work environment claim under the NYCHRL.  (JA, Ex. A, at 85:5-23; see also *Williams*, 872 N.Y.S.2d at 41 (1st Dep't 2009) (finding that sexual comment made in plaintiff's presence on one occasion, which was not directed at her, was trivial and non-actionable).)

With respect to the comments allegedly made about plaintiff by a few employees, the court finds most of them to be non-actionable because they amount to nothing more than "petty slights and trivial inconveniences." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd,* 713 F.3d 163 (2d Cir. 2013).

More troubling, however, are plaintiff's bare allegations, which are unsupported elsewhere in the record, that CNO Scher directly told plaintiff on one occasion that she did not like black Haitians.  Plaintiff apparently stated for the first time at her deposition that CNO Scher told her during her 2015 interview for the CNM position that she did not like black Haitians; this salient detail was not included in plaintiff's HR complaint, nor in her EEOC complaint.  (JA, Ex. G, at 58:9-20.) Plaintiff has also alleged that she was told by Mr. Pryce that CNO Scher stated she did not like Haitians, though as noted

above, Mr. Pryce has denied that CNO Scher ever made that comment.  (JA, Ex. G, at 58:13-14, 61:2-4.)[14]

It is puzzling to the court that CNO Scher would have promoted plaintiff to CNC, which included a $32,723 salary raise, on the heels of an interview in which CNO Scher allegedly told plaintiff that she did not like black Haitians and, by logical extension, plaintiff.  Nevertheless, the court is mindful that the Second Circuit has found that even a single comment may be actionable in the proper context.  *Mihalik*, 715 F.3d at 109.  Because the court must not weigh the evidence or make factual determinations as to whether certain events occurred, the court hereby **denies** defendant summary judgment as to plaintiff's discrimination and hostile work environment claims under the NYCHRL.  *Williams*, 872 N.Y.S.2d at 39 ("At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether [actionable] conduct occurred.").

Title 28 U.S.C. § 1367(c) provides that a district court may decline to exercise supplemental jurisdiction over a claim where "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c); *In re Valencia*, 316 F.3d 299, 305 (2d Cir. 2003).  Where "all federal-

---

[14] Plaintiff did not witness CNO Scher making this comment to Mr. Pryce.

59

law claims are eliminated before trial, the balance of factors.
. . judicial economy, convenience, fairness, and comity. . .
will point toward declining to exercise jurisdiction over the
remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 350 n.7 (1988).

Accordingly, the court declines to exercise its
supplemental jurisdiction over plaintiff's NYCHRL discrimination
and hostile work environment claims, and dismisses those claims
without prejudice pursuant to 28 U.S.C. § 1367(c)(3). *Itar-Tass
Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448
(2d Cir. 1998).

## CONCLUSION

For the foregoing reasons, the court GRANTS
defendant's motion for summary judgment with respect to
plaintiff's discrimination, hostile work environment, and
retaliation claims, under Title VII and the NYSHRL; GRANTS
defendant summary judgment with respect to plaintiff's
retaliation claim under the NYCHRL; and DENIES defendant summary
judgment with respect to plaintiff's discrimination and hostile
work environment claims under the NYCHRL.

As noted above, the court dismisses without prejudice plaintiff's NYCHRL discrimination and hostile work environment claims, pursuant to 28 U.S.C. § 1367(c)(3).  The Clerk of Court is respectfully directed to enter judgment against plaintiff and close the case.

**SO ORDERED.**

Dated:   September 20, 2020
         Brooklyn, New York

                                    _____/s/_____
                                    **HON. KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York

61